**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHLOMIT RUTTKAMP, | |
| Plaintiff, | |
| v. | No. 3:10-cv-392 (SRU) |
| RUPERT DE LOS REYES, LAWRENCE MERRILL, JR., KAREN M. GABIANELLI, and RICHARD MULHALL, | |
| Defendants. | |

## RULING ON DEFENDANTS' MOTIONS FOR RECONSIDERATION AND SECOND MOTION FOR SUMMARY JUDGMENT

Plaintiff Shlomit Ruttkamp brought this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of her Fourth and Fourteenth Amendment rights after she was twice arrested and later committed for an emergency medical evaluation over the course of a chaotic weekend in July 2009. The Complaint sought damages on multiple claims for unlawful search and seizure, false imprisonment, false arrest, and malicious prosecution. On January 24, 2012, I granted summary judgment in favor of the defendants on all claims except the false arrest and malicious prosecution claims arising from the July 5, 2009 arrest for interfering with a police officer in violation of Conn. Gen. Stat. § 53a-167a.[1] With regard to the surviving claims, I concluded that, on the record before me, genuine issues of material fact remained on the elements of probable cause and favorable termination.

---

[1] *See* Tr. of Summ. J. Hrg. (Jan. 21, 2012), at 31-32 (doc. # 48). I also granted summary judgment in favor of Defendant De Los Reyes on all claims, including those arising out of the July 5, 2009 arrest, due to his lack of personal involvement. *See id.* at 2-3.

Defendants Lawrence Merrill[2], Karen Gabianelli, and Richard Mulhall (collectively "Defendants") moved for reconsideration of my ruling on probable cause (docs. # 49 and # 50). Shortly thereafter, Defendants filed, with leave of the Court, a second motion for summary judgment, supported by several supplemental affidavits, on the issue of favorable termination (doc. # 51). As explained more fully below, Defendants' motions for reconsideration are without merit and are therefore DENIED. Further, because factual disputes remain on the element of favorable termination, Defendants' second motion for summary judgment must also be DENIED.

## I.  Factual Background

The facts set forth below are taken from the parties' Local Rule 56(a) Statements (docs. # 29-18, # 30-1, # 31-1, # 38-1, and # 51-2) and supporting affidavits. The facts recited are undisputed unless otherwise indicated. Because this case is currently at the summary judgment stage, disputed facts are considered in the light most favorable to Ms. Ruttkamp, the nonmoving party. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 74 (2d Cir. 2010) (per curiam).

Plaintiff Shlomit Ruttkamp ("Shlomit") was born and raised in Israel, but moved to the United States in the 1980s to live with her then-boyfriend, William Ruttkamp ("Billy"), in Stamford, Connecticut. The couple had one daughter, Tracy Ruttkamp ("Tracy"), in 1988 and later married. In 1997, the family moved into a house in Westbrook, Connecticut where Shlomit and Billy eventually started a landscaping business. *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶¶ 1-5.

---

[2] On July 10, 2012, after the instant motions were filed and fully briefed, the parties stipulated to the dismissal of Lawrence Merrill as a defendant in this case (doc. # 59). I approved the stipulation on July 12, 2012 (doc. # 60). Accordingly, the only remaining defendants are Karen Gabianelli and Richard Mulhall.

As the years passed, Billy and Shlomit's relationship became more and more tumultuous. Billy developed drug and alcohol problems, Shlomit had anger management issues, and both were reportedly physically and verbally abusive.  *See id.* ¶ 6; Dep. of Shlomit Ruttkamp, at 8, attached as Ex. 1 to Pl.'s Br. in Opp'n (doc. # 30-3); Aff. of Tracy Ruttkamp, at ¶ 3, attached as Ex. B. to State Trooper Defs.' Mot. for Summ. J. (doc. # 29-3).  The marriage deteriorated even further when a friend, Susan Anewalt, moved into the family's Westbrook home and became sexually involved with both Shlomit and Billy.  *See* Aff. of Tracy Ruttkamp, at ¶ 3.

In June 2009, Tracy, then twenty-one years old, told Billy she could no longer stand to live in the Westbrook house because her mother was too controlling and because she could no longer tolerate the unhealthy sexual relationships and physical abuse going on in the home.  *Id.* at ¶ 5.  Billy decided to leave Shlomit and file for divorce.  He found an apartment in Chester, and Tracy agreed to sign the lease and move in with him.  *Id.*

In the early morning of July 3, 2009, Billy and Tracy moved out of the Westbrook house and into the Chester apartment.  A few hours later, Shlomit was served with divorce papers and became extremely upset.  Shlomit appeared at Tracy's place of employment and an argument ensued.  *Id.* at ¶ 6.  The police were eventually called to the scene, but the officers found no reason to detain Shlomit or Tracy.  *See* Incident Rep., at 69, attached as Ex. C. to State Trooper Defs.' Mot. for Summ. J. (doc. # 29-4).  Later that evening, while staying with Billy at the Chester apartment, Tracy received multiple voicemails from Shlomit on her cellphone in which her mother allegedly threatened to kill herself, Billy and Tracy.[3]  *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶ 16.

---

[3] Shlomit denies that she ever threatened to kill Tracy, but admits that she may have left voicemails threatening to kill herself and Billy.  *See* Pl.'s Local R. 56(a)(2) Smt. ¶ 16.

A.   July 4, 2009 Arrest

On July 4, 2009, Shlomit apologized to Tracy for the previous day's events and convinced Tracy to tell her where Tracy and Billy were now living.  *Id.* ¶ 19.  Later that evening, Shlomit accompanied Tracy to the Chester apartment, but when Shlomit attempted to enter the home against Billy's will, a physical altercation ensued.  Neighbors, hearing the commotion, called the police.  *See id.* ¶ 16; Pl.'s Local R. 56(a)(2) Stmt. ¶ 23.  The police arrived, including defendant Trooper Mulhall,[4] and detained Billy.[5]  The police then proceeded to arrest Shlomit and charged her with Disorderly Conduct and Simple Trespass.  *See* Investigation Rep., attached as Ex. 2 to Pl's Br. in Opp'n (doc. # 30-3).  After Shlomit was released from custody, Tracy drove Shlomit to the Westbrook house at approximately 4:00 a.m. and decided to stay the night with her mother because Tracy did not feel safe staying with Billy.  *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶ 25.

B.   July 5, 2009 Arrest

On the morning of July 5, 2009, Billy grew concerned for Tracy and telephoned his sister, Cindy Mammone.  Billy informed Mammone of the events of the preceding days and expressed his fear that Shlomit might be holding Tracy against her will.  *Id.* at 27.   After Tracy failed to respond to several text messages, Mammone called a relative, Trooper De Los Reyes, at his home while he was off duty.  *Id.*  ¶¶ 29-30.  After a short conversation, both De Los Reyes

---

[4] Trooper Nicholas Tewell was also on the scene, but he is not a named defendant in this suit.  *See* Compl., at 1.

[5] Shlomit contends that, although the police "appeared" to arrest Billy, he was not actually arrested.  *See* Pl.'s Local R. 56(a)(2) Stmt. ¶ 23.  However, the police report of Trooper Nicholas Tewell states that Billy was arrested and charged with Disorderly Conduct as well as Third Degree Assault.  *See* Investigation Rep., attached as Ex. Q to State Trooper Defs.' Reply Br. (doc. # 36).

and Mammone placed calls to the Westbrook police and expressed their concerns to Defendant Sergeant Gabianelli.  Sergeant Gabianelli, in turn, decided to do a well-being check on Tracy at the Westbrook home.  *See* Aff. of Karen Gabianelli, at ¶ 6, attached as Ex. F to State Trooper Defs.' Mot. for Summ. J. (doc. # 29-7).[6]

Defendants Trooper Mulhall and Constable Merrill were the first officers to arrive at the Westbrook home.  The officers asked to enter the home to check on Tracy's well-being and Shlomit agreed.  *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶ 38.  Shlomit let the officers into the home and told them that Tracy was upstairs in her bedroom.  *Id.*  Constable Merrill went upstairs to check on Tracy, while Trooper Mulhall stayed with Shlomit in the foyer of the house.  *Id.* ¶ 39.   Merrill asked Tracy's permission to enter the bedroom to speak with her, and she agreed.  Thereafter, Sergeant Gabianelli arrived at the scene and went straight to Tracy's bedroom.  Gabianelli asked Tracy if she was being held against her will and Tracy answered in the negative.  *Id.* ¶ 44.  Believing the matter was over, Gabianelli and Merrill proceeded downstairs and made their exit.

Meanwhile, Mammone learned from Billy that Shlomit had called Tracy and left threatening voicemail messages on her cell phone.  *Id.* ¶ 52.  Mammone telephoned the Westbrook police and asked them to pass this information on to Sergeant Gabianelli.  Back at the Westbrook home, as she walked across the front lawn, Gabianelli received a call from State Police Troop F asking her to telephone their office.  Gabianelli called the dispatcher and was informed about the threatening voicemail messages that Shlomit allegedly left on Tracy's cell phone.  *Id.*  ¶¶ 53-55.

---

[6] Sergeant Gabianelli thereafter confirmed that the Old Saybrook Police had been called on July 3, 2009 when Shlomit pulled Tracy out of her workplace.  *See* Aff. of Karen Gabianelli, at ¶ 6.

After learning this information, Gabianelli turned back and approached Tracy on the lawn.  *Id.* ¶ 56.  Gabianelli told Tracy that her father was concerned because Shlomit had been leaving threatening voicemails on her cell phone.[7]  *Id.*  Gabianelli asked Tracy if Shlomit had left threatening messages, but Tracy hesitated because Shlomit was staring at her.[8]  *Id.* ¶ 58.  Sergeant Gabianelli then asked Tracy if she would play the messages for her.  Shlomit testified as follows:

> [W]hen Officer Gabianelli was asking [Tracy] to play the thing, she was staring at me.  She wasn't even intending to do it.  She was staring at me.  I said, "Tracy, you don't have to do it.  You have rights.  They have to have a search warrant" . . . . After Sergeant Gabianelli said, "Don't listen to her, play them, play them[,]" I said, "Don't.  They will get me in trouble.  I can go to jail."

Dep. of Shlomit Ruttkamp, at 70, attached as Ex. 1 to Pl.'s Br. in Opp'n (doc. # 30-3).[9]  At her deposition, Shlomit also stated that when she made these verbal protestations she was at least five feet away from her daughter and never made any physical attempt to take the cell phone

---

[7] The cell phone in question belonged to Tracy and was under Billy's account.  *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶ 57.

[8] According to Shlomit, neither she nor Tracy ever confirmed to Sergeant Gabianelli that threatening messages were, in fact, left on Tracy's cell phone.  Dep. of Shlomit Ruttkamp, at 51-53, attached as Ex. 1 to Pl.'s Br. in Opp'n (doc. # 30-3).

[9] Tracy described these events slightly differently.  She testified:

> I agreed [to play the messages]. No one coerced me. Of my own free will, I took out my phone and, as I was getting ready to dial my voicemail, my mother said, "Don't play that, they will send me to jail. Do you want me to go to jail? You will never see me again." I continued to dial the phone and put it on speaker phone so that everyone could hear the voicemails. My mother then got jumpy and screamed louder as she waived her hands, "they need a warrant, they need a warrant. Don't let them do that!"

Aff. of Tracy Ruttkamp, at ¶ 18, attached as Ex. B. to State Trooper Defs.' Mot. for Summ. J. (doc. # 29-3).  Shlomit's version is credited for purposes of the present motions.

from her.[10]  *See id.* at 54, 73.  Nevertheless, Tracy never played the voice messages for the

officers.  Shlomit was then arrested for interfering in violation of Conn. Gen. Stat. § 53a-167a.

Sometime later, after Shlomit had been transported via patrol car to the booking station,

Sergeant Gabianelli had Shlomit involuntarily committed for a mental health evaluation given

her erratic behavior and suicidal ideations.  *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶¶

63-64.

C.    Nolle Prosequi in Connecticut Superior Court

The officers referred the criminal matters to Senior Assistant State's Attorney Barbara

Hoffman who was responsible for prosecuting the case.  In an affidavit submitted to the Court,

Hoffman stated that she agreed to enter a nolle prosequi on both sets of charges (arising from

both the July 4, 2009 and the July 5, 2009 incidents) because Shlomit completed counseling that

was recommended by the Family Relations Division of the Connecticut Judicial Branch

(hereinafter "Family Relations").  *See* Aff. of Barbara Hoffman, at ¶ 14, attached as Ex. K to

State Trooper Defs.' Mot. for Summ. J. (doc. # 29-12).  On October 23, 2009, Assistant State's

Attorney Brian Kennedy appeared in Superior Court before Judge Vitale and entered the nolle.

*See* Tr. of Proceedings, attached as Ex. L to State Trooper Defs.' Mot. for Summ. J. (doc. # 29-

13).  The transcript of the hearing itself, however, contained no mention of the nolle being

conditional on the completion of counseling or any other requirement.  *See id.*  Moreover, when

Shlomit was asked at her deposition whether the prosecutor agreed to nolle the case because she

_____

[10] Shlomit denied making any attempt to swat the phone away from Tracy's hands.  Dep.
of Shlomit Ruttkamp, at 73.  Further, Shlomit testified that she never attempted to reach for
Tracy or touch the officers.  *Id.* at 75.

had completed family counseling, she replied in the negative. *See* Dep. of Shlomit Ruttkamp, at 96.[11]

## II.     Procedural Background

On March 16, 2010, Shlomit filed the instant lawsuit, seeking damages under 42 U.S.C. § 1983 for unlawful search and seizure, false arrest, false imprisonment, and malicious prosecution. *See* Compl. (doc. # 1). Defendants later moved for summary judgment on all claims (docs. # 29 and # 31).

At a hearing held on January 24, 2012, I granted summary judgment in favor of Defendants in substantial part, but denied summary judgment on the false arrest and malicious prosecution claims arising from the July 5, 2009 arrest for interfering under Conn. Gen. Stat. § 53a-167a. *See* Tr. of Summ. J. Hrg. (doc. # 48). As I stated in my oral ruling, the claim for false arrest survived summary judgment "because the officers lacked probable cause to arrest for interference with a police officer, because that arrest was based only on the plaintiff's verbal protestations or verbal pleading to her daughter not to turn over a cell phone, which is not sufficient under decisions of the Connecticut Supreme Court to sustain a claim for interference with a police officer under Connecticut Law." *See id.* at 4. Further, the officers were not entitled to qualified immunity because, under clearly established Connecticut law, verbal interference alone does not violate section 53a-167a unless "fighting words" are used. *See id.* at 5-9 (citing *State v. Williams*, 205 Conn. 456 (1987)). Lastly, the claim for malicious prosecution survived because "there [was] a genuine issue of material fact with respect to whether the prosecution

---

[11] Specifically, when asked at her deposition whether the prosecutor agreed to nolle the case because she had gone to family counseling, Shlomit responded: "No, no. They just agreed to nolle the case because they felt that it was to be nolled. Actually, I went to see the counselor before the nolle. . . . Actually, my lawyer suggested to me before we even went into the family court to look for a counselor." Dep. of Shlomit Ruttkamp, at 96.

against the plaintiff for that arrest terminated in her favor." *Id.* Specifically, there was conflicting evidence in the record before me on whether the nolle entered pursuant to a bargained-for exchange with the plaintiff, and thus factual disputes remained on the issue of favorable termination. After issuing the ruling, I granted Defendants request for leave to file a second motion for summary judgment on the narrow issue of favorable termination if Defendants were able to supplement the record with additional affidavits showing the nolle was, in fact, entered pursuant to a bargained-for exchange. *Id.* at 27.

On February 21, 2012, Defendants moved for reconsideration of my ruling on probable cause (docs. # 49 and # 50). Shortly thereafter, on February 24, 2012, Defendants filed a second motion for summary judgment on the issue of favorable termination, supported by several supplemental affidavits (doc. # 51).

## III.    Defendants' Motions for Reconsideration

I begin by addressing Defendants' motions for reconsideration.[12] As explained more fully below, both motions lack merit and are therefore denied.

### A.    Standard of Review

The standard for granting motions for reconsideration is strict. Motions for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Motions for reconsideration will not be granted where the party merely seeks to re-litigate an issue that has already been decided. *Id.* The three major grounds for granting a motion for reconsideration are: (1) an intervening change of controlling law, (2) the

---

[12] Both motions seek identical relief, but each is supported by different arguments and case citations.

availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 4478).

      B.    Discussion

     In their motions for reconsideration, Defendants contend that I erred in determining that genuine issues of material fact remained on whether the officers had at least arguable probable cause to arrest Shlomit for interfering on July 5, 2009.[13]  Defendants, however, have not introduced any controlling law or particular facts that I overlooked in considering their motions for summary judgment, nor have they otherwise indicated a manifest injustice requiring reconsideration.  Rather, the proffered grounds for reconsideration are nothing more than attempts to relitigate issues previously decided, *see Shrader*, 70 F.3d at 257, or attempts to raise arguments that should have been raised before my ruling.  *See Packer v. SN Servicing Corp.*, 250 F.R.D. 108, 112 (D. Conn. 2008) ("Motions for reconsideration are not designed to allow parties to make arguments that they could have and should have made before the court ruled.").  Nonetheless, I briefly address each of Defendants' arguments below.

     It is axiomatic that probable cause provides an arresting officer with an absolute defense

---

[13] Defendants wrongly assert that "the Court, sua sponte, also raised that Shlomit's verbal conduct of trying to convince her daughter not to turn over evidence to the police is protected by the First Amendment."  *See* Mem. of Law in Supp. of Joint Mot. for Reconsideration (doc. # 49-1), at 3.  Defendants, frankly, misapprehend the basis of my ruling.  I never raised, nor was there ever any need to raise, a separate First Amendment challenge to Shomit's arrest for verbal interference.  The Connecticut Supreme Court has already limited the scope of section 53a-167a to proscribe only physical conduct and "fighting" words.  *See State v. Williams*, 205 Conn. 456, 473-76 (1987) ("To avoid the risk of constitutional infirmity, we construe § 53a-167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace.") (internal quotation omitted).  Thus, I merely applied controlling Connecticut law—law that has been clearly established for more than twenty years—to conclude that Defendants lacked probable cause to arrest Shlomit for interfering based on verbal statements that all parties agree did not amount to "fighting" words.

to claims of false arrest and malicious prosecution. *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002). Probable cause exists if the defendants had "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense ha[d] been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal citations omitted). "Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer." *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 246 (D. Conn. 2003) (citing *Weyant v. Okst*, 101 F. 3d 845, 852 (2d Cir. 2003)). Where there are critical facts in dispute, however, the case is one for the jury. *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

In the case at bar, Shlomit's claims turn on whether Defendants had probable cause, or at least arguable probable cause, to arrest her for interfering. Under Connecticut law, a person is guilty of interfering with an officer "when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties." Conn. Gen. Stat. § 53a-167a. The law prohibits any action that intentionally meddles in or hampers a police officer in the performance of her duties. *State v. Williams*, 205 Conn. 456, 471-72 (1987); *White v. Wortz*, 66 F. Supp. 331, 334 (D. Conn. 1999). Where the offending conduct is merely verbal, however, the Connecticut Supreme Court has held that it does not constitute illegal interference to "merely question[] a police officer's authority or protest[] his or her action." *Williams*, 205 Conn. at 472. Rather, the Court limited the statute's verbal application to "fighting words" only; that is, words that "'by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Id.* at 473 (quoting *Houston v. Hill*, 482 U.S. 451, 461-62 (1987)); *see also Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988) ("In construing the Connecticut statute to proscribe

only physical conduct and "fighting" words, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572

(1942), the court in *Williams* was able to fit the statute within the constitutional parameters of

free speech.").   Fighting words "portend imminent physical violence or are likely to prompt

imminent physical retaliation."  *State v. Szymkiewicz*, 237 Conn. 613, 619 (1996).  Also, because

police officers are expected to exercise a higher degree of restraint than the average citizen, the

type of "fighting words" that would violate this statute is narrower than under other actionable

circumstances.  *Williams*, 205 Conn. at 474 n.7.

 First, Defendants argue that I overlooked Connecticut authority pertaining to verbal

conduct sufficient to warrant an arrest for interfering.[14]  Specifically, Defendants contend that

recent Connecticut cases have expanded the range of conduct that is violative of section 53a-

167a beyond physical resistance and speech amounting to "fighting" words.  Defendants rely on

two recent Connecticut Supreme Court decisions, *State v. Aloi*, 280 Conn. 824 (2007), and *State

v. Silva*, 285 Conn. 447 (2008).  Neither case controls the outcome here.

 In *Aloi*, the Court upheld a conviction for interference where the defendant refused an

officer's request to produce identification during the course of a lawful *Terry* stop.  280 Conn. at

840–41.  The Court reasoned that a refusal to comply with a request for identification during an

investigative stop constituted verbal "conduct"[15] that may hamper or delay the progress of that

---

[14] Defendants also cite multiple decisions from foreign jurisdictions—notably
interpreting different state statutes—to support their motions for reconsideration.  *See, e.g., King
v. Ambs*, 519 F.3d 607, 615 (6th Cir. 2008); *Lawyer v. City of Council Bluffs*, 361 F.3d 1099,
1107 (8th Cir. 2004); *People v. Knight*, 910 N.Y.S. 2d 358 (Crim. Ct. 2010); *People v. Gibbs*,
115 Ill. App. 2d 113 (1st Dist. 1969).  However, citations to non-controlling decisions from
foreign jurisdictions are entirely insufficient to meet the strict standards for reconsideration.  *See
Shrader*, 70 F.3d at 257 (stating that motions for reconsideration "will generally be denied unless
the moving party can point to *controlling* decisions or data that the court overlooked") (emphasis
added).

[15] The Court was careful to point out that the state was relying on the defendant's *conduct*

investigation and, therefore, amount to illegal interference.  *Id.* at 834.  Similarly, in *Silva*, the

Court relied on its previous decision in *Aloi* to uphold a jury verdict for illegal interference where

the defendant had refused to produce identification at the officers' request after they had

observed Silva violating several traffic laws.  285 Conn. at 456-57.  Significantly, however, the

*Aloi* Court specifically limited its holding to the narrow facts of that case, stating:  "Although a

refusal to comply with certain other types of lawful police commands or orders may provide a

basis for prosecution under § 53a–167a, . . . for purposes of this opinion, we need not consider

any factual scenario other than the scenario presented by the lawful *Terry* stop in the present

case."  *Aloi*, 280 Conn. at 841 n.22 (internal citations omitted).

     The case at bar obviously does not involve a *Terry* stop or a refusal to comply with a

police officer's request for identification.  Thus, Defendants' reliance on *Aloi* is simply

misplaced.  But even more broadly, Shlomit's verbal conduct did not involve the kind of

disobedience and noncompliance that *Aloi* and its progeny meant to bring within section 53a-

167a's reach.  As this Court has noted elsewhere, "Connecticut courts most frequently find

illegal interference with a police officer where the officer makes a direct request, which the

defendant refuses to comply with, and it is that *refusal* that hinders or impedes the course of the

investigation of the defendant or the performance of the officer's duties."  *Acevedo v. Sklarz*, 553

F. Supp. 2d 164, 168 (D. Conn. 2008) (citing *State v. Peruta*, 24 Conn. App. 598 (1991)).

     Here, as in *Acevedo*, Shlomit never refused to comply with an officer's requests nor did

_____

in refusing to provide identification, and not his attendant *speech*, to support the conviction for
interfering.  *Aloi*, 280 Conn. 834 n.14 ("[T]he state relies on the defendant's conduct in refusing
to provide Salvatore with identification, and not on the defendant's speech, to support the
defendant's conviction.  Moreover, as the state notes, there is nothing in the record to indicate
that the defendant's conviction was predicated solely on the defendant's speech as distinguished
from his conduct.").  Here, however, Shlomit never refused any officer's request and nothing in
Shlomit's verbal pleadings or protestations converted her speech to anything resembling
"conduct."

she disobey an officer's orders.  Instead, crediting Shlomit's version of events, when the officers

asked Tracy to play the messages from her phone, Tracy looked to her mother for guidance and

Shlomit responded, saying:  "Tracy, you don't have to do it.  You have rights.  They have to

have a search warrant."  Dep. of Shlomit Ruttkamp, at 70.  However, even after Shlomit made

these statements, no one ordered Shlomit not to speak or requested that she leave the scene of the

investigation.[16]  Rather, when the officers pressed Tracy to play the messages, Shlomit, standing

at least five feet away, pleaded: "Don't.  They will get me in trouble.  I can go to jail."  *Id.* at 70-

71.  Shlomit's verbal conduct may have been dissuasive and desperate, but it was never

disobedient.  Nor did Shlomit's statements somehow aid, abet, or exhort Tracy to *unlawfully*

refuse an officer's request.  Unlike the defendants in *Aloi* and *Silva*, Tracy was never "seized" as

the object of a legitimate *Terry* stop.  Instead, the officers sought her *consent* to what amounted

to a search of her voicemail messages.  Tracy was always free to refuse, whether on her own

accord or upon the advice of her mother.  Thus, nothing in *Aloi* or *Silva* persuades me to

reconsider my ruling that a jury could find that Defendants lacked probable cause to arrest

Shlomit for interfering.[17]

_____

[16] For this reason, Defendants' heavy reliance on *King v. Ambs*, 519 F.3d 607 (6th Cr. 2008), is unavailing.  *King* involved an arrest for obstruction under a Michigan township ordinance.  In that case, the defendant repeatedly urged his friend to ignore an officer's questions and continued to interrupt the investigation even after the officer commanded the defendant to stop interfering.  *Id.* at 610. Unlike the officer in *King*, the officers here never told Shlomit that she was interrupting their investigation, nor did they instruct her to desist.

[17] Defendants also cite an unpublished district court decision, *Foster v. Carr*, 2006 WL 1980314 (D. Conn. July 13, 2006), for the proposition that verbal statements may violate the interference statute.  *Foster*, however, inadvertently overlooked *Williams* and relied exclusively on the Appellate Court's decision in *State v. Alloi*, 86 Conn. App. 363 (2004), a decision that was later reversed in part by the Connecticut Supreme Court.  *See State v. Alloi*, 280 Conn. 824 (2007).  In granting summary judgment in favor of defendants on the basis of qualified immunity, *Foster* concluded that "even assuming for purposes of this ruling that *Aloi*, which was decided in 2004, sets forth that verbal statements cannot constitute a sufficient basis to arrest

Second, Defendants argue that they are entitled to qualified immunity because the law pertaining to verbal interference aimed at third parties, rather than police officers, was not clearly established.  In support, Defendants stress that there is no case specifically holding that the interfering statute does not reach verbal protestations and entreaties made to third parties—like Tracy—who are the objects of police investigation.  However, the absence of specific authority directly on point does not necessarily entitle Defendants to qualified immunity.  *See Shabazz v. Coughlin*, 852 F.2d 697, 701 (2d Cir. 1988).   Law can be clearly established for purposes of qualified immunity analysis, even in the absence of specific authority directly on point, if state court decisions "clearly foreshadow a particular ruling on the issue."  *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (internal quotation marks omitted).  Indeed, as the Second Circuit noted in *Shabazz*, the absence of case law can be explained in part because police departments have "seen the writing on the wall" and trained their officers to avoid arrests they know will pose constitutional problems.  *Shabazz*, 852 F.2d at 701.

As noted above, the Connecticut Supreme Court specifically limited the scope of the interference statute as follows: "To avoid the risk of constitutional infirmity, we construe § 53a-167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace."  *Williams,* 205 Conn. at 473 (internal quotation marks omitted).  This unequivocal statement from the state's highest court "leaves no room for an interpretation that would permit an arrest for verbal interference involving

---

pursuant to section 53a-167a, this law was not established at the time of plaintiff's arrest [in 2002]."  *Foster*, 2006 WL 1980314, at *4.  Unfortunately, *Foster* neglected to consult *Williams*, a case decided in 1987, in which the Connecticut Supreme Court stated: "To avoid the risk of constitutional infirmity, we construe § 53a-167a to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace." 205 Conn. at 473 (internal quotation marks omitted).  For this reason, I do not find the Court's reasoning in *Foster* persuasive.

something other than fighting words." *Darbisi v. Town of Monroe*, 2002 WL 32348250, at *2 (D. Conn. Jan. 11, 2002).

Here, there is no dispute that Shlomit's verbal interference never amounted to fighting words; nothing she said tended "to incite an immediate breach of the peace." *Williams*, 205 Conn. at 473. Shlomit neither threatened her daughter nor urged any violent or physical response to the officer's request. Thus, the fact that Shlomit's verbal pleadings and protestations were directed at her daughter, instead of an officer, is immaterial. No matter who she was talking to, Shlomit's speech, which "merely question[ed] a police officer's authority or protest[ed] his or her action," was plainly outside the reach of section 53a-167a as construed by the Connecticut Supreme Court.[18] *Id.* at 472.

Third, Defendants argue that, even if they lacked probable cause to arrest for interfering, they had at least arguable probable cause to arrest Shlomit for other crimes. As Defendants correctly point out, when defending against claims for false arrest, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "[A] claim for false arrest turns only on whether probable case existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge

---

[18] Defendants also argue that the officers had probable cause to arrest Shlomit for interfering based on her "physical conduct" in following Tracy and the officers into the yard when Gabianelli asked to hear the phone messages. *See* Mem. of Law in Supp. of Joint Mot. for Reconsideration (doc. # 49-1), at 17. This argument is entirely meritless. Shlomit did nothing more than walk out onto her own front lawn and stand approximately 5-10 feet away from the officers. The entire incident occurred on Shlomit's property—an area where she had every right to be. Moreover, unlike the defendant in *State v. Peruta*, 24 Conn. App. 598 (1991), Shlomit was never asked to move away from the scene, and therefore never disobeyed an officer's command to do so. On these facts, reasonable officers could not disagree that Defendants lacked probable cause to arrest Shlomit for interfering based solely on her "physical conduct" in following the officers onto her own front lawn.

actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149,

154 (2d Cir. 2006); *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 552 (S.D.N.Y. 2007)

(granting summary judgment in favor of the defendants on a false arrest claim where the plaintiff

was arrested for felony assault on a police officer but there was, "at minimum, probable cause to

believe that the plaintiff had committed disorderly conduct").

At the outset, it bears mentioning that, even if Defendants could establish that they had

probable cause to arrest Shlomit for crimes other than interfering, the battle is only half won.

The Second Circuit has made clear that, although the existence of probable cause to arrest for

other, uncharged crimes provides a defense to claims of false arrest, that fact does not otherwise

preclude claims for malicious prosecution. *See D'Angelo v. Kirschner*, 288 F. App'x 724, 726

(2d Cir. 2008) ("*Jaegly* did not involve a malicious prosecution claim and its holding is not

applicable to such a claim. On the contrary, it is error 'to conflate probable cause to arrest with

probable cause to believe that [D'Angelo] could be successfully prosecuted.'") (quoting *Posr v.

Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)) (alteration in original). But

putting that obstacle aside, the hurdle remains high for disposing of the false arrest claim, too.

Even assuming, *arguendo*, that other crimes could be implicated or imagined in this case,

genuine disputes remain regarding whether the officers had probable cause, or even arguable

probable cause, to arrest Shlomit for those crimes as well.[19]

---

[19] As noted above, I previously granted Defendant's motion for summary judgment on Shlomit's false imprisonment claim arising out of the officers' later decision to involuntarily commit Shlomit for a mental health evaluation based on her suicidal ideations. *See* Tr. of Summ. J. Hrg. (Jan. 21, 2012), at 4. Connecticut law authorizes any police officer "who has reasonable cause to believe that a person is mentally ill and dangerous to himself, herself, or others" and "in need of immediate care and treatment" to take such a person into custody or "cause such person to be taken to a general hospital for emergency examination." Conn. Gen. Stat. § 17a-503. However, the fact that Defendants arguably had "reasonable cause" to involuntarily commit Shlomit for an evaluation does not necessarily defeat her claim for false arrest. As an initial

Defendants claim they had probable cause to arrest Shlomit for three other crimes: (1) threatening in the second degree in violation of Conn. Gen. Stat. § 53a-62; (2) harassment in the second degree in violation of Conn. Gen. Stat. § 53a-183; and (3) stalking in the third degree in violation of Conn. Gen. Stat. § 53a-181e. I briefly address each in turn.

Under Connecticut law, a person is guilty of threatening in the second degree when:

> (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) such person threatens to commit any crime of violence with the intent to terrorize another person, or (3) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror.

Conn. Gen. Stat. § 53a-62. Defendants' argue they had probable cause to arrest Shlomit for "threatening" based on reports that Shlomit left voicemail messages on Tracy's cell phone stating she would kill herself, Billy and Tracy. However, factual disputes remain with regard to what information the officers actually possessed about the voicemails at the time of Shlomit's arrest. Where the facts available to the arresting officers immediately preceding the arrest are in dispute, summary judgment is inappropriate. *See, e.g., Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) (dispute regarding facts necessary to establish constitutional violation precluded summary judgment based on qualified immunity).

As an initial matter, Shlomit has unequivocally denied ever threatening to kill Tracy,

---

matter, it is undisputed that the decision to involuntarily commit Shlomit came sometime after she was arrested for interfering and taken to the station for booking. But regardless of timing, the two claims are sufficiently distinct so that the failure of one claim does not doom the other. Although "false arrest" and "false imprisonment" derive from the same species of tort, an arrest involves a materially different harm than a medical evaluation. An arrest, unlike a medical evaluation, is designed to punish and comes with the added risk of criminal prosecution. Moreover, the quantum of proof necessary to support an arrest differs from that of a medical evaluation. An officer must have "probable cause" to support an arrest, while mere "reasonable cause" suffices for an evaluation under section 17a-503. Thus, my previous ruling on the false imprisonment claim does not necessarily dictate the outcome on the false arrest claim.

though she admitted she may have left messages threatening to harm herself and/or Billy.  *See* Pl.'s Local R. 56(a)(2) Smt. ¶ 16.  Moreover, according to Shlomit's account, which must be credited on summary judgment, when Gabianelli asked Tracy whether her mother left any threatening messages, Tracy never responded.  *See* Dep. of Shlomit Ruttkamp, at 52-53.  Thus, unlike the officers in *Pierson v. Hancock*, 2011 WL 2938060 (D. Conn. July 19, 2011), and *Leon v. Fisher*, 2007 WL 2874777 (D. Conn. Sept. 28, 2007), the officers here could not rely on complaints from the putative victim to support a finding of probable cause.  *See Miloslavsky v. AES Eng'g Soc'y*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness"), *aff'd*, 993 F.2d 1534 (2d Cir. 1993). Rather, the only evidence of threatening the officers had at the time of the arrest was based on Mammone's phone call to the police station.  But that report was itself based on uncorroborated hearsay:  Mammone informed the police that her brother, Billy, had revealed to her that Shlomit had left threatening voicemail messages on Tracy's phone.  *See* State Trooper Defs.' Local R. 56(a)(1) Stmt. ¶ 52.  Mammone, however, never had access to Tracy's cell phone, never heard any of the voicemails, and had not even spoken to Tracy herself for several days.  Thus, the basis of her knowledge was tenuous at best.  *See, e.g., Nieves v. New York City Police Dept.*, 2010 WL 330205, at *2 (S.D.N.Y. Jan. 26, 2010) (finding officers lacked probable cause to arrest based on "uncorroborated hearsay statement" from an informant who "was not an eyewitness to the shooting, had no personal knowledge of the shooter's identity, and [where] defendants took no steps to corroborate her statement prior to arresting [plaintiff]."); *see also Cortez v. McCauley*, 478 F.3d 1108, 1119 (10th Cir. 2007) (en banc) (holding that officers lacked probable cause to execute a warrantless arrest where they "relied, without any investigation, exclusively on the

double-hearsay statement of a nurse who had no personal knowledge of the actual facts . . .

especially given that officers could easily have interviewed the nurse . . . or the [victim with

whom the nurse spoke] before moving to arrest [plaintiff]").  Based on the disputed record before

me, I cannot conclude as a matter of law that the officers had sufficient credible information to

support a finding of probable cause to arrest Shlomit for threatening.  Thus, Defendants'

argument fails to persuade me to alter my previous ruling.

 For essentially the same reasons, Defendants' argument regarding harassment in the

second degree also falls short.  A person is guilty of harassment in the second degree when:

> (1) By telephone, he addresses another in or uses indecent or obscene language; or
> (2) with intent to harass, annoy or alarm another person, he communicates with a
> person by telegraph or mail, by electronically transmitting a facsimile through
> connection with a telephone network, by computer network, as defined in section
> 53a-250, or by any other form of written communication, in a manner likely to
> cause annoyance or alarm; or (3) with intent to harass, annoy or alarm another
> person, he makes a telephone call, whether or not a conversation ensues, in a
> manner likely to cause annoyance or alarm.

Conn. Gen. Stat. § 53a-183.  Defendants argue that they had probable cause to arrest Shlomit for

harassment based on Shlomit's multiple phone calls and allegedly threatening messages over the

previous two days.  However, as explained above, according to Shlomit's version of events, at

the time of the arrest the officers had no specific information from the putative victim (i.e.,

Tracy) that Shlomit had placed harassing phone calls.  Thus, material issues of fact remain in

dispute as to what credible information the officers could have relied on in making an arrest for

harassment.

 Lastly, Defendants claim they had probable cause to arrest Shlomit for stalking in the

third degree.  A person is guilty of stalking in the third degree when she "recklessly causes

another person to reasonably fear for his physical safety by willfully and repeatedly following or

lying in wait for such other person."  Conn. Gen. Stat. § 53a-181e.  Here, Defendants contend

they had probable cause to arrest Shlomit for stalking not because of her actions on July 5, 2009, but because of events that occurred two days earlier—when Shlomit pulled Tracy out of work to question her about the divorce.  The argument is meritless.  Defendants ignore the fact that the Old Saybrook police were called to investigate the events of July 3, 2009 that very same day and notably found no reason to detain either Shlomit or Tracy.  *See* Incident Rep., at 69, attached as Ex. C. to State Trooper Defs.' Mot. for Summ. J. (doc. # 29-4).  The investigation into any alleged "stalking" was already complete before the events leading to Shlomit's July 5, 2009 arrest even began.  Thus, Defendants' arguments on the existence of probable cause to arrest Shlomit for crimes other than interfering are unpersuasive.  I see no reason to alter my previous ruling in this case.

In sum, the asserted grounds for reconsideration are without merit.  Accordingly, the motions for reconsideration (docs.  # 49 and # 50) are denied.

## IV.   Defendants' Second Motion for Summary Judgment

I now turn to address Defendants' second motion for summary judgment regarding the element of favorable termination—an element both parties agree must be proven to sustain the plaintiff's claims for false arrest and malicious prosecution.  Because factual disputes remain on the circumstances surrounding the nolle prosequi entered in this case, Defendants' second motion for summary judgment must also be denied.

### A.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary

judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a genuine issue of material fact, there must be contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his

case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, there can be no genuine issue as to

any material fact, since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial.  *Id.* at 322-23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

      B.    <u>Discussion</u>

Defendants move for summary judgment on the remaining false arrest and malicious

prosecution claims, arguing that the supplemental affidavits submitted in support of their motion

eliminate factual disputes requiring a trial on whether the prosecution for interference terminated

in Shlomit's favor.  I disagree.

In order to prevail on her false arrest claim, Shlomit must establish that "(1) the defendant

intentionally arrested [her] or had [her] arrested; (2) the plaintiff was aware of the arrest; (3)

there was no consent to the arrest; and (4) the arrest was not supported by probable cause."

*Drew v. City of Groton*, 2011 WL 2971768, at *6 (D. Conn. July 21, 2011) (internal citations

omitted).   Although the Connecticut Supreme Court has not yet spoken on the issue,[20] the

Second Circuit has held that favorable termination is an element of false arrest under Connecticut

---

[20] As other district courts have noted, "Connecticut law is unsettled as to whether a plaintiff, in order to prove a claim of false arrest, must show that the prosecution terminated in his favor."  *Spencer v. Connecticut*, 560 F. Supp. 2d 153, 161-62 (D. Conn. 2008) (citing *Weyant v. Okst,* 101 F.3d 845, 853 (2d Cir.1996)).

law.  *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) ("[F]avorable

termination is an element of 'a section 1983 claim sounding in false imprisonment or false

arrest.'") (quoting *Roesch v. Otarola*, 980 F.2d 850, 952 (2d Cir. 1992)).[21]

Similarly, to prove a malicious prosecution claim, Shlomit must show: "(1) the defendant

initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal

proceedings terminated in favor of the plaintiff; (3) the defendant acted without probable cause;

and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an

offender to justice."  *Bauer v. City of Hartford*, 2010 WL 4429697, at *10 (D. Conn. Oct. 29,

2010) (quoting *Bhatia v. Debek*, 287 Conn. 397 (2008)).

A plaintiff "may satisfy the favorable termination element by showing that the charges . .

. were discharged without a trial under circumstances amounting to the abandonment of the

prosecution without request by him or arrangement with him."  *Frey v. Maloney*, 476 F. Supp. 2d

141, 147 (D. Conn. 2007).  As the Second Circuit has noted, the "majority of cases from

Connecticut courts interpret Connecticut law so that a nolle prosequi satisfies the 'favorable

termination' element as long as the abandonment of the prosecution was not based on an

arrangement with the defendant."  *Roberts v. Babkiewicz*, 582 F.3d 418, 421 (2d Cir. 2009); *see*

*also Holman v. Cascio*, 390 F. Supp. 2d 120, 123 (D. Conn. 2005) ("[A] nolle of a criminal

---

[21]  *Roesch*'s holding on this issue has been called into question.  *See Spencer v. Connecticut*,
560 F. Supp. 2d 153, 161-62 (D. Conn. 2008) (citing *Colon v. Ludemann,* 283 F. Supp. 2d 747,
753-54 (D. Conn. 2003)).  Moreover, as a matter of logic, it is possible to contemplate
circumstances where the *Roesch* rule would be inapplicable.  For instance, one can imagine a
plausible claim for false arrest where, at the time of arrest, the officers lacked probable cause, but
sometime later—after the detention but before prosecution—probable cause is uncovered.  In
such a scenario, even in the absence of a favorable termination, the arrest was still a "false"
arrest because there was no probable cause when the harm—the unjustified detention—was
complete.  Nevertheless, *Roesch* "remains good law that this Court must follow absent a ruling to
the contrary from the Second Circuit or a Connecticut appellate court."  *Miles v. City of
Hartford,* 2010 WL 148452 at *5 (D. Conn. Jan. 12, 2010) (citing cases).

charge may still permit the plaintiff to satisfy [the favorable termination] element if the circumstances of the nolle satisfy the *See v. Gosselin* test[22] of an abandonment of prosecution without request from or by an arrangement with [the defendant].").  However, "a nolle will preclude a subsequent case for malicious prosecution when it is made as part of a plea bargain or under other circumstances that indicate that the defendant received the nolle in exchange for providing something of benefit to the state or victim."  *Holman*, 390 F. Supp. 2d at 123-24.

Here, Defendants contend that Shlomit's false arrest and malicious prosecution claims fail because the current record, as supplemented, demonstrates that the nolle prosequi resulted from a bargained-for exchange and, therefore, cannot constitute a favorable termination.  In support, Defendants have submitted additional affidavits from Senior State's Attorney Barbara Hoffman, the prosecutor for the state criminal charges, and Carl J. Fortuna, the attorney who represented Shlomit on the state criminal charges.

---

[22] In *See v. Gosselin*, 133 Conn. 158, 159 (1946), the Connecticut Supreme Court first encountered the question of whether a nolle prosequi may satisfy the element of favorable termination.  The Court noted that "[i]t is generally held that the plaintiff must allege and prove that the criminal action terminated in his favor, either by his acquittal or in some other manner equivalent thereto." *Id.*  In holding that the allegations of the circumstances of the nolle in that case satisfied the test, however, the court explained:

> When we made "discharge" a condition of bringing an action of malicious prosecution, it signified the termination of the particular prosecution.  It is not necessary that the accused should have been acquitted.  It is sufficient if he was discharged without a trial under circumstances amounting to an abandonment of the prosecution without request from or by arrangement with him.

*Id.* at 160.  Although district courts have reached different conclusions on whether a nolle prosequi bars a claim of false arrest or malicious prosecution, *see Lagasse v. City of Waterbury*, 2011 WL 2709749, at *5 (D. Conn. July 12, 2011), the majority of courts, relying on *See*, have held that a nolle prosequi satisfies the favorable termination element as long as the abandonment of the prosecution was not based on an arrangement with the defendant.  *See, e.g.*, *Pizarro v. Kasperzyk*, 596 F. Supp. 2d 314, 318 (D. Conn. 2009).

In her new affidavit, Barbara Hoffman attests that "at the outset of these proceedings, I had a verbal agreement with Ms. Ruttkamp's attorney, Carl Fortuna, Jr., that I would enter nolles in both cases if Ms. Ruttkamp completed the recommendations of the Family Relations Division."  Aff. of Barbara Hoffman, at ¶ 6, attached as Ex. B to State Trooper Defs.' Second Mot. for Summ. J. (doc. # 51).  Hoffman stated that "Ms. Ruttkamp completed the recommendations . . . [and] at my direction, Assistant State's Attorney Brian Kennedy . . . entered the nolles."  *Id.* at ¶ 7.  Hoffman also indicated that, due to heavy caseloads and insufficient time, it is customary for prosecutors to enter into verbal plea agreements in misdemeanor cases.  *Id.* at ¶ 8.

Mr. Fortuna, Shlomit's former attorney testified:  "I had an agreement with Senior State's Attorney Barbara Hoffman that, in exchange for my client, Shlomit Ruttkamp, completing the recommendations of the Family Relations Division . . . Hoffman would enter nolles to both cases."  Aff. of Carl Fortuna, at ¶ 4, attached as Ex. C to State Trooper Defs.' Second Mot. for Summ. J.  (doc. # 51).  Fortuna stated that Shlomit completed the recommendations and "Brian Kennedy appeared . . . and entered the nolles."  *Id.* at ¶ 5.

In response, Shlomit submitted a new affidavit of her own.  In that affidavit, Shlomit stated that she first met with a counselor, Mark D. Aron, on her own initiative on or about July 9, 2009 and that she began counseling permanently with another therapist, Linda Kaufman, on or about July 16, 2009.  *See* Aff. of Shlomit Ruttkamp, at ¶¶ 2-3, attached as Ex. 1 to Pl.'s Opp'n. to Summ. J. (doc. # 56).  According to Shlomit, her first court appearance and meeting with Family Relations did not occur until July 21, 2009—several days *after* she had already begun counseling.  *Id.* at ¶ 4.  Shlomit testified, "It is my understanding that a nolle was entered for the charge in question . . . based upon the recommendation of the Family Relations Division . . . and

not based upon anything that I had bargained for or was subsequently required to do.  No one . . . ever told me I had any requirements to fulfill, including that I needed to complete any recommendations or counseling." *Id.* at ¶¶ 7-8.  She concluded, "To my knowledge I did not have an agreement with State's Attorney Barbara Hoffman." *Id.* at ¶ 9.  Shlomit also submitted a letter from Mark D. Aron stating that he met with Shlomit on July 9, 2009.  *See* Aff. of Mark Aron, attached as Ex. 2 to Pl.'s Opp'n to Summ. J. (doc. # 56).

Thus, the survival of Shlomit's remaining claims turn on whether these competing affidavits eliminate the need for trial on the issue of favorable termination.  If the prosecution for interfering terminated in the plaintiff's favor, or if factual questions remain on whether the termination was favorable, both claims survive summary judgment.  *See Holman,* 390 F. Supp. 2d at 124 ("The factual circumstances surrounding the nolle are material and when disputed, must be resolved by the trier of fact.").  If not, summary judgment must be granted in favor of Defendants.

A termination is "unfavorable" when there is a quid pro quo exchange for the entry of the nolle.  *Holman,* 390 F. Supp. 2d at 123-24.  Generally speaking, a "contract" must be formed by the parties entering into a bargained-for exchange.  *Id.* at 124. The prosecutor's mere exercise of discretion in entering a nolle, in the absence of a bargain, will not satisfy the standard.  *See Pizarro v. Kasperzyk*, 596 F. Supp. 2d 314, 318 (D. Conn. 2009) ("In Connecticut, 'termination in favor of the plaintiff' has been interpreted as termination without consideration.") (citing *DeLaurentis v. City of New Haven,* 220 Conn. 225, 251 (1991)).  Where "the reasons for a dismissal of charges are in dispute, the matter should ordinarily be submitted to a jury." *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 131 (2d Cir. 1997).

Although this case presents a close question, I conclude that material issues of fact remain on the circumstances surrounding the entry of the nolle in this case.  Defendants argue that Shlomit's charges were terminated unfavorably pursuant to a verbal agreement between the prosecutor and Shlomit's attorney that a nolle would be entered in exchange for Shlomit completing the recommendations of Family Relations.   But it remains unclear what those "recommendations" were and whether Shlomit ever completed them.  According to Shlomit's sworn affidavit, no one ever gave her *any* requirements to fulfill nor informed her that she had to complete any recommendations or counseling for the nolle to be entered.  *See* Aff. of Shlomit Ruttkamp, at ¶ 8.  Instead, Shlomit maintains that she began counseling with a family therapist *prior* to her first court appearance on July 21, 2009 and that, to her knowledge, she never had any agreement with the prosecutor.  *See id.* at ¶¶ 2-4.

Thus, even assuming, for the sake of argument, that Attorney Fortuna entered into an agreement with the prosecutor—and that Shlomit was bound by that agreement despite her ignorance of it—Shlomit was never given, nor did she complete, any recommendations by Family Relations.  Looking at these facts, as I must, in the light most favorable to the plaintiff, a reasonable jury could conclude that, regardless of whatever agreement her attorney may have arranged, Shlomit never performed her side of the bargain.  Consequently, a jury could find that, despite Shlomit's failure to perform, the State's Attorney decided, in an act of discretion, to enter the nolle anyway.  Under these circumstances, the nolle could not have resulted from a bargained-for exchange because Shlomit never supplied the promised consideration.  Thus, material issues of fact remain regarding whether Shlomit's participation in counseling was, in fact, "consideration" for the entry of a nolle prosequi in this case, or whether it was merely

"considered" by the State's Attorney in exercising discretion to unilaterally abandon the prosecution.

Because the circumstances surrounding the nolle are in dispute, genuine issues of material fact remain to be resolved and summary judgment is inappropriate. *See Holman*, 390 F. Supp. 2d at 125-26 ("Although a close call, the plaintiff's deposition testimony that the nolles were not entered as part of a plea bargain, and that the nolles were entered over two years after his arrest, is enough to withstand a motion for summary judgment. The plaintiff has created a genuine issue of material fact whether his case was favorably terminated, one that a trier of fact must resolve."); *Haynes v. City of New London*, 2002 WL 1204956 at *2 (D. Conn. Aug. 29, 2005) (denying motion for summary judgment as to false arrest claim because "the exact circumstances and intent behind the nolles are not entirely clear").  Accordingly, Defendants' second motion for summary judgment (doc. # 51) must be denied.

## V.     Conclusion

For the reasons stated above, Defendants' motions for reconsideration (docs. # 49 and # 50) and second motion for summary judgment (doc. # 51) are DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of August 2012.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge